**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**CAPITAL CITY PUBLIC**
**CHARTER SCHOOL,**

       **Plaintiff,**

**v.**

**ROBERTA GAMBALE,** *et al.,*

       **Defendants.**

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**Civil Action No. 13-cv-253 (RMC)**

</td></tr>
</table>

**OPINION**

       This is an action for attorney's fees incurred by Capital City Public Charter School in its own defense at an administrative proceeding under the Individuals with Disabilities Education Act. The Hearing Officer denied all claims, finding that the Parent was responsible for the actions about which she complained, not the school. Capital City alleges that the matter was initiated and continued by Defendants Roberta Gambale, Esq., and James E. Brown & Associates, PLLC, and that it was frivolous, unreasonable, and without foundation. Defendants respond that Ms. Gambale advanced legitimate claims and that the decision in Capital City's favor was based on credibility determinations.

       Having reviewed the entire record, the Court finds that Defendants initiated and continued a proceeding that was frivolous, unreasonable, and without foundation. Capitol City will be awarded the attorney's fees it requests, which the Court finds are essentially uncontested and reasonable.

# I.  BACKGROUND

## A.  The Individuals with Disabilities Act

Congress enacted the Individuals with Disabilities Education Act (IDEA), as amended, 20 U.S.C. § 1400 *et seq.*, to guarantee a free appropriate public education (FAPE) to disabled students.  A FAPE is an education that, *inter alia*, "emphasizes special education and related services designed to meet [disabled students'] unique needs and prepare them for further education, employment, and independent living . . . ."  *Id.* § 1400(d)(1)(A).  All "states and territories, including the District of Columbia, that receive federal education assistance must establish policies and procedures to ensure, among other things, that . . . [a] FAPE[] is available to disabled children" within their school districts.  *Branham v. Gov't of the Dist. of Columbia*, 427 F.3d 7, 8 (D.C. Cir. 2005) (internal quotation marks and citations omitted).

IDEA identifies a disabled student as "a child . . . (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services."  20 U.S.C. § 1401(3)(A).  Once a student is identified as disabled, the relevant Local Educational Agency (LEA), which is the "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools," *id.* § 1401(19)(A), must devise a comprehensive, individualized education program (IEP) for that child, *id.* § 1414(d)(2)(A).  A multidisciplinary IEP Team, which includes "the child's parents and select teachers[] as well as a representative of the [LEA]

with knowledge [of] the school's resources and curriculum, develops an . . . IEP . . . for the child." *Branham*, 427 F.3d at 8 (internal quotation marks and citations omitted).

An IEP must balance competing concerns. At a minimum, an IEP must "'provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005) (alteration in original) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982)). In addition, an IEP must ensure, "[t]o the maximum extent appropriate," that the disabled student is placed in the least restrictive environment, ideally receiving his education alongside children who are not disabled. 20 U.S.C. § 1412(a)(5)(A). "If no suitable public school is available, the [school system] must pay the costs of sending the child to an appropriate private school." *Branham*, 427 F.3d at 9 (alteration in original omitted) (internal quotation marks and citations omitted).

Parents of disabled students participate in the development and implementation of their child's IEP. 20 U.S.C. §§ 1414(e), 1415(b)(1). A parent who objects to the "identification, evaluation, or educational placement" of their child is entitled to a due process hearing before a qualified, impartial hearing officer. *Id.* §§ 1415(b)(6), (f)(1). At the hearing, the parent and the LEA have "the right to be accompanied and advised by counsel," *id.* § 1415(h)(1), "present evidence and confront, cross-examine, and compel the attendance of witnesses," *id.* § 1415(h)(2), and appeal the hearing officer's findings administratively, *id.* § 1415(g). Further, the party who prevails at the due process hearing may bring a civil action for reasonable attorney's fees. *Id.* §§ 1415(i)(2)(A), (3)(B)(i).

## B. Factual Background

Capital City Public Charter School is a District of Columbia public charter school which has elected to serve as its own LEA under IDEA.[1]  Answer [Dkt. 3] ¶ 3.  Roberta Gambale is an attorney licensed to practice in the District of Columbia.  She represented the Student, a seventeen-year-old young man who needed special education and related services, and the Student's Parent in an administrative proceeding under IDEA.[2]  *Id.* ¶¶ 4, 6.  James E. Brown & Associates, PLLC, is a law firm in the District of Columbia and was Ms. Gambale's employer at the time Ms. Gambale filed and litigated the administrative complaint.  *Id.* ¶ 5.

On March 23, 2012, Ms. Gambale filed an IDEA complaint against Capital City, alleging that it had failed to provide a FAPE to the Student as required by IDEA.  *See* 20 U.S.C. § 1400(d)(1)(A).  Ms. Gambale sought various forms of relief, including amendments to the Student's IEP concerning his post-secondary education goals, compensatory education due to the absence of a FAPE, and reimbursement to the Parent for expenses she incurred in arranging a college tour for the Student.  Admin. R. (IDEA Compl.) [Dkt. 6-1] at 15.

---

[1] The Court takes the facts from the Hearing Officer Decision (HOD), which was not appealed by the Parent.  *See* 20 U.S.C. § 1415(i)(2)(B) (requiring judicial challenges to HODs be brought no later than ninety days after the date of decision).  The HOD, therefore, represents a final judgment of an administrative body that acted in a judicial capacity.  The findings of the Hearing Officer cannot be relitigated here.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 9 (D.C. Cir. 2001) ("'When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.'" (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)).

[2] Because this lawsuit solely concerns an attorney-fee claim against lawyers, the Court will not intrude into the family's privacy further by identifying the Parent and Student in this Opinion.

### 1. The Student's Local School Placements

The Student began attending Capital City in Washington, D.C., in the fourth grade. Due to his multiple disabilities, he was eligible to receive specialized instruction and related services. Admin. R. (HOD) [Dkt. 6-5] at 813-14. His mental health declined during the first semester of his freshman year of high school, Admin. R. (Parent Testimony) [Dkt. 6-8] at 1199, and it was determined that he should be placed at the Frost School (Frost), a private, special education day school, HOD at 814; Pl. Resp. to Defs. Statement of Material Facts [Dkt. 15] ¶ 6. In its role as LEA, Capital City transferred the Student to Frost in December 2009. The Student had a difficult time with the transition, became a truant, and was suspended multiple times in late 2009 and early 2010. HOD at 814.

Having missed school days, the Student received extended school year services during the summer of 2010. However, in July 2010, he got into separate fights at Frost with a teacher and with another student, who was seriously injured. After these incidents, the director of Frost suggested to the Parent that the Student may require placement at a residential school and that the IEP Team should discuss such a placement for the upcoming school year. (Frost did not itself convene an IEP Team meeting at that time.) Then, in August 2010, the Student stopped taking his medications, refused to meet with his doctor or attend school, and became violent at home. He was hospitalized at the Psychiatric Institute of Washington from August 16 to August 21, 2010, and then again, from September 10 to September 17, 2010. *Id.* at 814-15.

### 2. IEP Team Meetings

On September 3, 2010, Frost formally asked the Student's IEP Team to assemble for the purpose of reviewing and updating his IEP. The IEP coordinator at Frost faxed a "Letter of Invitation to a Meeting" to the Parent, Ms. Gambale, and Capital City. Admin. R. (Sept. 3,

2010 Letter of Invitation) [Dkt. 6-3] at 472. The Invitation was a form letter. It provided several check-boxes to indicate the purpose of the meeting, such as "discuss[ion] [of] possible changes in the setting for [the Student]." *Id.* Frost only checked the box indicating that the purpose of the IEP Team meeting was "to develop/review/revise or update [the Student's] current IEP." *Id.* The Invitation set the meeting for September 20, 2010, at 10:15 a.m.

Five days later, on September 8, 2010, Ms. Gambale sent an email to Frost and the Parent to confirm the meeting. Ms. Gambale also reported to Frost that Children's National Medical Center was conducting a psychiatric evaluation of the Student, and warned that the meeting might have to be postponed if that evaluation were not available for the IEP Team's review by September 20. Ms. Gambale explained that a psychiatric evaluation was necessary because the Parent was concerned about the Student's behavior and thought he may need a more restrictive school setting. HOD at 815; *see also* Admin. R. (Sept. 8, 2010 Email from Ms. Gambale) [Dkt. 6-3] at 475-76 (adding "that is why the psychiatric recommendation would be of particular importance for the team to review").

On September 14, 2010, Capital City invited the District of Columbia Office of the State Superintendent of Education (OSSE) to the meeting set for September 20.[3] Apparently, at some point between September 8 and September 14, 2010, Frost had shared Ms. Gambale's concerns about the Student's placement with Capital City, as Capital City advised OSSE that the likely purpose of the IEP Team meeting was to discuss placing the Student at a residential treatment facility. *Id.* at 815. Meanwhile, Frost drafted a new IEP for the Student and circulated

---

[3] OSSE is the State Education Agency of the District of Columbia. It is charged, among other obligations, with monitoring LEAs for compliance with IDEA. *See* OSSE, Specialized Education Program, http://osse.dc.gov/service/specialized-education (last visited Mar. 12, 2014).

it to the IEP Team members ahead of the meeting set for September 20. *See* Admin. R. (Testimony of Wanda Gregory, Capital City's LEA representative) [Dkt. 6-9] at 1362.

The September 20 meeting never happened. At 7:45 a.m. on September 20, Ms. Gambale sent an email to Frost and Capital City, telling them that the meeting needed to be rescheduled because the psychiatric recommendation for the Student was not available. Admin. R. (Sept. 20. 2010 Email from Ms. Gambale) [Dkt. 6-3] at 478. In this email, Ms. Gambale said that the awaited psychiatric evaluation was being performed by the Psychiatric Institute of Washington.[4] Since the Parent was unprepared, the meeting was postponed. HOD at 815-16.

And then, on September 24, 2010, Ms. Gambale sent a written request to Frost that asked for a psychiatric evaluation of the Student, indicating that the Parent had not been able to obtain an evaluation from the Psychiatric Institute of Washington. HOD at 816. Capital City, which was copied on this request and which needed to approve and pay for an evaluation as LEA, responded six days later. It informed Ms. Gambale that it needed the Parent to sign a release for medical records and to provide any information she had about the Student's recent hospitalizations at the Psychiatric Institute of Washington. Admin R. (Sept. 30 to Oct. 7, 2010 Email Chain) [Dkt. 6-3] at 488-89. Ms. Gamble provided a release and the requested information on that same day, *id.* at 487-88, and an IEP Team meeting was set for October 14, 2010, *id.* at 486.

---

[4] It is doubtful that an evaluation of the Student was actually in progress when Ms. Gambale postponed the September 20 IEP Team meeting. *Compare* Admin. R. [Dkt. 6-2] (Sept. 8, 2010 Email from Ms. Gambale) at 311 ("It is my understanding that [C]hildren's [H]ospital is conducting a psychiatric evaluation . . . ."), *and* Admin. R. (Sept. 9, 2010 Email from the Parent) [Dkt. 6-2] at 313 ("I called [the Psychiatric Institute of Washington] and left word for the comprehensive report"), *with* Admin. R. (Sept. 24, 2010 Request to Frost and Capital City) [Dkt. 6-2] at 322 ("The [P]arent, . . . by and through counsel, . . . requests[] that her minor child be evaluated with a psychiatric assessment to determine his possible need for[] a residential placement. [The Parent] has been unable to obtain an evaluation from Psychiatric Institute of Washington.").

This time, the IEP Team met as planned. Team participants included Ms. Gambale, the Parent, OSSE, Capital City, and Frost. They discussed the process for placement of the Student into a residential facility, which would first require a psychiatric evaluation. HOD at 816; *see also id.* at 827 ("The team needed the psychiatric assessment to inform them of the Student's needs, [and] the type of residential facility that would be appropriate for him."). Capital City agreed to pay for an independent psychiatric evaluation of the Student and authorized the Parent to select a psychiatrist for that purpose. *Id.* at 816. Neither Ms. Gambale nor the Parent raised concerns about the new IEP circulated in September by Frost, although all Team members anticipated that a revised IEP would be completed after the psychiatric evaluation. Admin. R. (October 14, 2010 Meeting Notes) [Dkt. 6-3] at 503-04 (indicating that the IEP would be finalized after the Student's psychiatric evaluation); Gregory Testimony at 1362-63 ("Q[:] And at any time after providing that draft IEP, specifically the September 20, 2010 [IEP], . . . were you aware of any concerns that the [P]arent had about the IEP? A[:] Not to my knowledge.").

A psychiatric evaluation of the Student was conducted by the psychiatrist chosen by the Parent on October 21, 2010. HOD at 817. In the meantime, the Student continued to exhibit behavioral problems at home. On October 25, 2010, Ms. Gambale informed OSSE and Capital City that the police had "just taken" the Student to the Psychiatric Institute of Washington. *Id.* On that same day, Capital City notified Ms. Gambale, the Parent, and OSSE, that Capital City agreed, even without a psychiatric evaluation, that the Student needed a residential school placement in light of the difficulties he was having. OSSE responded three days later, stating that it would move ahead with changing the Student's placement to a residential facility. *Id.*

On November 19, 2010, Ms. Gambale received the psychiatrist's report from the October 21, 2010 evaluation of the Student. Defs. Mot. for Summ. J. (MSJ) [Dkt. 8], Ex. 1 (Nov. 19, 2010 Email from Ms. Gambale) [Dkt. 8-4] at 1. The evaluating psychiatrist recommended that the Student be placed in a residential treatment center, be prescribed psychotropic medications, and remain compliant with dosage instructions. Ms. Gambale sent a copy of the evaluation to OSSE and Capital City on November 19, 2010, the day she received it. *Id.*; HOD at 817.

Later on November 19, 2010, OSSE responded to Ms. Gambale, telling her that it needed the Parent's signature on an interstate compact form "*in order to process the request* for [the Student's] residential placement" in an out-of-state facility.[5] Admin. R. (Nov. 19, 2010 Email from OSSE) [Dkt. 6-3] at 542-43 (emphasis added). Nearly two months passed before Ms. Gambale returned the signed interstate compact form to OSSE. HOD at 818.

In the meantime, Capital City proposed scheduling another IEP Team meeting for November 30, December 1, December 6, or December 7, 2010. Admin. R. (Nov. 24, 2010 Letter to Ms. Gambale) [Dkt. 6-3] at 538. The Parent selected December 6, 2010, and the IEP Team convened on that date. HOD at 818. At that IEP Team meeting, which Ms. Gambale did not attend, the IEP Team discussed residential placement options for the Student. The Parent informed the IEP Team at the end of the meeting that the Student would remain at the Psychiatric Institute of Washington until his new school placement was finalized. *Id.* Again, the

---

[5] The District of Columbia has a paucity of residential facilities for children needing special education services but the obligation to provide such services rests with the District nonetheless. In this context, an interstate compact form appears to be an agreement between the District and a State that the State will provide required services within its borders and the District will reimburse it. A parent's agreement is required to send a special education student outside the District for educational services.

Parent did not voice concerns about the IEP as it was drafted in September. Admin R. (Dec. 6, 2010 Meeting Notes) [Dkt. 6-3] at 546.

### 3. The Student's Residential Placement

On January 5, 2011, Ms. Gambale informed Capital City and OSSE that she had found a residential treatment center in Pennsylvania that would accept the Student for admission. Ms. Gambale provided OSSE with the signed interstate compact form two days later, on January 7, 2011, and OSSE submitted the form to the District of Columbia Child and Family Services Agency four days later. HOD at 818-19. On January 21, 2011, OSSE notified the Parent that it had issued a location assignment for the Student to attend Devereux Beneto Center-Mapleton (Devereux), a Pennsylvania residential treatment facility. Admin. R. [Dkt 6-2] (Jan. 21, 2011 Notice of Location Assignment) at 410. Approximately three weeks later, OSSE sent transportation that picked up the Parent and Student at their home, transported them to Devereux for the Student's admissions processing, and then returned the Parent to her home. HOD at 819.

The upshot of this sequence of events is that the Student missed a significant period of time from school in the fall of 2010. He did not earn any school credits while hospitalized at the Psychiatric Institute of Washington between October 2010 and February 2011. Essentially, by the time the Student was placed in Devereux for residential treatment, he had missed the equivalent of one-half of a school year. *Id.*

### 4. Subsequent IEP Team Meetings

The first six months of the Student's stay at Devereux were marked by multiple behavioral incidents. After that, however, he settled down and made significant progress, earning ninety-nine to one hundred percent of his "behavioral" points. *Id.* at 821. He was selected as a school delegate, which required him to exhibit good personal hygiene, dress

10

appropriately, show visitors around the school, and meet with a teacher twice a week to review his social skills. The Student also worked at the school as a janitor, cleaning the campus and school gym. This job required him to track his hours on a biweekly basis and understand his pay stubs. *Id.*

Additional IEP Team meetings concerning the Student were held on April 15, 2011, and May 6, 2011. Admin R. (Apr. 15, 2011 Meeting Notes) [Dkt. 6-3] at 594-97; Admin. R. (May 6, 2011 Meeting Notes) [Dkt. 6-3] at 599. Among the participants at the April 15 IEP Team meeting were Ms. Gambale, the Parent, and Capital City. Apr. 15, 2011 Meeting Notes at 594. While the Parent and Capital City also attended the May 6 meeting, Ms. Gambale did not. May 6, 2011 Meeting Notes at 599. Transition plans to help the Student move beyond high school were discussed at both meetings. *See, e.g.*, Parent Testimony at 1261 (stating that the Student's transition plan was discussed at the April 15 meeting). There is no indication in the record that either Ms. Gambale or the Parent voiced any concerns about the transition plans for the Student during, or after, the April 15 or May 6, 2011 IEP Team meetings. *See* Apr. 15, 2011 Meeting Notes at 594-97; May 6, 2011 Meeting Notes at 99; *see also* Gregory Testimony at 1370 ("Q[:] So other than the corrections or requests for revisions . . . where [sic] there any other concerns raised by the [P]arent or her attorney regarding the IEP reviewed on April 15, 2011? A[:] No."). Indeed, it appears that Ms. Gambale and the Parent reviewed the proposed IEPs and suggested only "a couple of minor corrections." Admin. R. (Jul. 20, 2011 Email from Ms. Gambale) [Dkt. 6-3] at 663.

On March 19, 2012, the Parent attended another IEP Team meeting with Capital City, Devereux, and the Parent's education advocate (but not Ms. Gambale).[6] At that point, the Student was about to graduate from high school. The Parent made several requests at the meeting related to the Student's post-secondary education. The Parent also asked for transportation for the Student to travel home to Washington, D.C. for that weekend to make a college tour. The staff of Devereux suggested that the Student could, and should, take a bus or train home on his own; he was about to graduate from high school and independent travel would be "good practice" for him. HOD at 820. OSSE offered to reimburse the Parent for the ticket but she objected. She demanded that OSSE provide the same transportation service that it had provided to transport the Student to Devereux. *Id.*

The Parent also asked the IEP Team to add specific transition goals to the IEP that would address the Student's completion of college applications, registration for the Scholastic Aptitude Test (SAT), and college tour. In addition, she requested payment to cover the costs of the college tour that she had planned. Neither Devereux nor Capital City believed these goals should be added to the Student's IEP. Further, Devereux reminded the Parent that in emails dated December 1, 2011, February 27, 2012, and March 6, 2012, she had been advised that *she* needed to register the Student for the SAT. Capital City also advised the Parent that she needed to ask the SAT administrators for special education accommodations for the Student, and offered to assist her in that process. *Id.* Capital City agreed to consider the request for reimbursement for the college tour, *id.*, but asked the Parent to provide additional information, Admin. R. (Mar.

_____

[6] IDEA affords all parties to a due process hearing "the right to be accompanied and advised by . . . individuals with special knowledge or training with respect to the problems of children with disabilities." 20 U.S.C. § 1415(h)(1). The Parent's education advocate was a non-attorney employed by James Brown & Associates, PLLC. *See* Admin. R. (Testimony of Mia Long) [Dkt. 6-8] at 1150-51.

19, 2012 Email from Capital City's lawyer) [Dkt. 6-3] at 677. There is no evidence that the Parent or Ms. Gambale ever responded to the request for more information. Long Testimony at 1182, 1185-88; Gregory Testimony at 1436.

The Student's IEP Team ultimately agreed to a transition plan that included goals for the Student in the areas of post-secondary education and training, employment, and independent living. It did not include registering for the SAT or taking college tours. The Parent paid for the Student's round-trip bus fare from Pennsylvania to the District of Columbia and the college tour herself. The former cost $26.00 and the latter cost $400.00. *Id.* at 820-21.

Meanwhile, the Student continued to do well at Devereux. He worked on his transition goals: learning about the job application process, identifying career interests, completing job applications, and participating in mock interviews. He also learned how to budget money and expenses, identify his cost of living, use a bank and a checking account, and search the Internet for jobs, training programs, and colleges. With respect to his post-secondary plans, the Student received specific instruction on the college application process, including one-on-one SAT tutoring once a week. *Id.* at 822.

The Parent registered the Student for the SAT, which he took twice, in May and June 2012. Unfortunately, the Parent neither asked for special accommodations for the Student when he took the test nor asked Capital City for assistance in dealing with the SAT administrators. The Student performed poorly both times, and had a "meltdown" during the June 2012 examination. *Id.* at 823.

Approximately sixteen months after arriving at Devereux, the Student became eligible to graduate from high school. He had earned all of the required high school credits and

performed all of the required community service hours.  Accordingly, on June 12, 2012, the Student received his high school diploma.  *Id.* at 821.

### 5.  The IDEA Complaint

Prior to the Student's graduation, Ms. Gambale filed an IDEA complaint on March 23, 2012, against Capital City on behalf of the Parent and the Student.  At the time the IDEA complaint was filed, the Student was seventeen years old.  *Id.* at 813.  The IDEA complaint alleged that Capital City had failed to provide a FAPE to the Student by violating its obligations under IDEA in two distinct ways.  Answer ¶ 6.

First, the IDEA complaint alleged that Capital City had failed to place the Student in an appropriate educational setting in the fall of 2010.  In support of this claim, the IDEA complaint alleged that Capital City failed to respond in a timely manner to the Parent's request for a residential placement and failed to notify OSSE on a timely basis of her request.  Specifically, the complaint alleged that the Parent had requested the Student's placement in a residential treatment facility at an IEP Team meeting on September 9, 2010; a psychiatrist had concurred on October 21, 2010; but Capital City did not notify OSSE of the Parent's request or review the psychiatric evaluation until December 6, 2010, causing a lengthy delay in the Student's placement in a residential treatment facility.  IDEA Compl. at 8-9.

Second, the IDEA complaint alleged that Capital City failed to develop an appropriate transition plan and/or include appropriate transition service goals as part of the Student's September 20, 2010, April 15, 2011, and March 19, 2012 IEPs.  IDEA Compl. at 9-10.  Specifically, the IDEA complaint contended that these three IEPs were deficient in the following ways: (1) the September 20, 2010 IEP contained no goals related to independent livings skills; (2) the April 15, 2011 IEP contained no post-high school goals, such as the Student's college and

career plans or independent living skills; and (3) the March 19, 2012 IEP did not set the Student's college visits as a goal, support the Student in completing college applications, ensure the Student was researching college programs and progressing toward his IEP goals, or provide the Student with transportation so that he could return home to participate in a college tour. *Id.*

Capital City met with the Parent and Ms. Gambale on April 6, 2012, in a "resolution meeting" to resolve the IEP complaint. HOD at 811. Twelve days later, Capital City sent a written settlement proposal to Ms. Gambale, by which Capital City offered to reimburse the Parent for (1) the cost of two roundtrip tickets for the Student from Pennsylvania to Washington, D.C., and (2) the cost for the college tour that the Parent had arranged. Pl. MSJ [Dkt. 7], Ex. 1 (Apr. 18, 2012 Letter from Capital City's lawyer) [Dkt. 7-2] at 1-2. Ms. Gambale acknowledged receipt of the settlement offer and stated that she would discuss it with the Parent. *Id.*, Ex. 2 (Apr. 18, 2012 Email from Ms. Gambale) [Dkt. 7-2] at 1. No further response was ever forthcoming.

The Hearing Officer conducted a due process hearing on the Parent's IDEA complaint on June 8 and 11, 2012. HOD at 811-12. Less than two weeks later, the Hearing Officer issued a thorough, twenty-two page decision dismissing the IDEA complaint with prejudice. With respect to the first claimed violation, the Hearing Officer found that the Parent waited nearly a month after the psychiatric evaluation was completed by her own selected psychiatrist to provide it to Capital City and OSSE and let another seven weeks pass before she submitted the signed interstate compact form to OSSE that was necessary to process and authorize the Student's placement outside the District and to transport him to Devereux. *Id.* at 827-28. Accordingly, the Parent, not Capital City, was "primarily to blame for any delays in the Student's enrollment and placement in . . . [Devereux]." *Id.* at 828.

Further, the Hearing Officer found that the Parent had presented no testimony to support the allegations that completing college applications and taking a college tour were Capital City's responsibility, *id.* at 830, and had not identified any deficiency in the Student's IEPs other than the fact that the September 20, 2010 and April 15, 2011 IEPs "lacked goals to help the Student improve his personal hygiene and eating habits," *id.* However, the Parent also had presented no testimony that goals concerning personal hygiene and eating habits should have been included as education goals in the Student's IEPs rather than in a "behavior implementation plan." *Id.* In short, the Hearing Officer determined that the September 20, 2010, April 15, 2011, and March 19, 2012 IEPs were not deficient, and that, in fact, the Student had received extensive instruction and training while at Devereux in all relevant transition areas (post-secondary education, employment, and independent living skills). The Hearing Officer held that the Parent had failed to prove that Capital City had denied the Student a FAPE in any way. *Id.* at 831.

### 6. This Lawsuit

Capital City filed the instant Complaint on February 26, 2013. *See* Compl. [Dkt. 1]. It alleges that the IDEA complaint that Defendants brought and maintained against Capital City was frivolous, unreasonable, and without foundation. Accordingly, Capital City seeks reimbursement for the attorney's fees that it incurred in its defense, which it claims totaled $12,577.50. Compl. at 11.

The Administrative Record was filed on July 8, 2013. Cross motions for summary judgment were filed shortly thereafter. On December 9, 2013, the Court directed the parties to file supplemental briefing concerning the claimed fees, which the parties have now filed.

## II.  LEGAL STANDARDS

The parties do not contest that this Court has original jurisdiction over this matter, and the District of Columbia is the proper venue.  *See* 20 U.S.C. § 1415(i)(3)(A); 28 U.S.C. § 1331.  Nor do they disagree on the standard for summary judgment as set forth in Federal Rule of Civil Procedure 56: summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Under this standard, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Conversely, the nonmoving party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  Although a court draws all justifiable inferences in favor of a nonmoving party and accepts its evidence as true, *Anderson*, 477 U.S. at 255, that party must establish more than "a scintilla of evidence" in support of its position, *id.* at 252.  Allegations or conclusory statements are insufficient to support a nonmoving party's opposition.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

# III. ANALYSIS

Capital City and Defendants agree that there are no genuine disputes over material facts that would preclude summary judgment here. They also agree that IDEA authorizes an award of attorney's fees to a prevailing LEA when an administrative complaint filed against it was "frivolous, unreasonable, or without foundation . . . or clearly became frivolous, unreasonable, or without foundation." 20 U.S.C. § 1415(i)(3)(B)(i)(II). Further, the parties concur that if the Court awards fees to Capital City, it must base the award "on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." *Id.* § 1415(i)(3)(C).

## A. Capital City Was the Prevailing Party

In this jurisdiction, whether an IDEA claimant is a "prevailing party" turns on a three-part test developed by the D.C. Circuit. First, "there must be a 'court-ordered change in the legal relationship' of the parties;" second, "the judgment must be in favor of the party seeking the fees;" and, third, "the judicial pronouncement must be accompanied by judicial relief." *District of Columbia v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010) (quoting *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486, 492-93 (D.C. Cir. 2003)). Only the latter two requirements are considered when the defendant in an IDEA administrative proceeding seeks an award of attorney's fees. *Id.* (explaining that even though the test was "developed . . . in connection with requests for fees by plaintiffs, [the D.C. Circuit] [has] applied the latter two requirements to requests by defendants as well"); *see also District of Columbia v. Nahass*, 699 F. Supp. 2d 175, 182 (D.D.C. 2010) ("[W]here a defendant is seeking to establish 'prevailing party' status, that party need not establish a court-ordered change in the legal relationship of the parties."). When a HOD dismisses a due process complaint on the merits and the parent does not appeal that decision, the

LEA is the prevailing party. *See Bridges Pub. Charter Sch. v. Barrie*, 796 F. Supp. 2d 39, 47

(D.D.C. 2011) (citing *District of Columbia v. West*, 699 F. Supp. 2d 273 (D.D.C. 2010)).

There is no question or dispute that Capital City was the prevailing party in the

underlying administrative proceeding. The Hearing Officer reached a decision on the merits and

dismissed the IDEA complaint with prejudice. HOD at 831. Defendants did not appeal the

HOD. Sensibly, Defendants do not now contest that Capital City was the prevailing party.

Accordingly, the Court finds that Capital City was the prevailing party.

### B. Defendants Filed and Litigated a Frivolous Due Process Complaint

The litigated issue is whether Defendants filed a due process complaint, or

continued to litigate such a complaint, that was "frivolous, unreasonable, or without foundation."

20 U.S.C. § 1415(i)(3)(B)(i)(II). In making this determination, the focus is on the merits of the

case rather than its outcome. That is, whether the IDEA complaint at the time it was filed was,

or later became, "'so lacking in arguable merit as to be groundless or without foundation.'"

*West*, 699 F. Supp. 2d at 279 (quoting *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189

(11th Cir. 1985)).

### 1. The Allegations Concerning the Delay in the Student's Placement.

Capital City contends that it should be awarded attorney's fees because the

allegations that it caused the delay in the Student's placement at Devereux were baseless from

the very beginning and any delays that occurred were attributable to the Parent and Ms.

Gambale. Conceding, as they must, that the Hearing Officer ruled against the Parent, Defendants

argue that the Hearing Officer's "ultimate conclusions are not dispositive of what the outcome

would have been had the Hearing Officer chosen to believe the . . . testimony" Ms. Gambale

presented. Defs. Reply [Dkt. 16] at 8. Thus, Defendants argue that their evidence at the due

process hearing, if credited, substantiated their claims and that the credibility findings in the HOD do not make those claims any less meritorious prior to the decision. *See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1126 (9th Cir. 2011) (holding in an IDEA suit for attorney's fees that "so long as the plaintiffs present evidence that, if believed by the fact-finder, would entitle them to relief, the case is per se not frivolous and will not support an award of attorney's fees").

The problem with Defendants' argument is that the undisputed facts demonstrate that the allegation in the IDEA complaint that Capital City caused a delay in the Student's placement never had any basis in fact. As drafted, the IDEA complaint presented a parade of horribles: notified on September 9, 2010 that the Student needed to be placed in a residential facility, Capital City did nothing until an IEP Team meeting in mid-October; totally ignored a compelling psychiatric examination of the Student from the date it was conducted on October 21 until December; and never notified OSSE of the Parent's request until December. None of these alleged facts was accurate *and Ms. Gambale had full knowledge of the correct facts* when she drafted and filed the IDEA complaint.

Capital City did not hear from the Parent that she wanted the Student to be placed in a residential setting during an IEP Team meeting on September 9, 2010, for the simple reason that there was no IEP Team meeting on that day. Defendants now admit that "the actual request for a more restrictive placement was not made at an [IEP] meeting on that date." Defs. MSJ at 11. In fact, Ms. Gambale's suggestion that the Student may need residential housing was first made in an email she sent to *Frost* on September 8, 2010. *See* Sept. 8, 2010 Email from Ms. Gambale at 475-76 ("Parent is concerned about the re-emergence of prior behavior patterns and

about the *possible* need for a more restrictive setting for [the Student] . . . ." (emphasis added)).[7]

Defendants argue that the error in the IDEA complaint is inconsequential because Capital City was aware that the Student might need to be placed in a residential treatment facility as early as the summer of 2010. Specifically, Defendants claim that "[t]he first communication regarding [the Student's] need for a more restrictive placement came during the summer of 2010" when Frost told the Parent that the Student "might require a more restrictive placement." Defs. MSJ at 15. However, Defendants fail to provide any evidence as to when Capital City received this information. Further, the Parent's own recollection fails to support the Defendant's argument. Questioned by Ms. Gambale, the earliest date that the Parent could recall this information might have reached Capital City was September 3, 2010: the day on which Frost sent out the invitation for the September 20, 2010 IEP Team meeting. *See* Parent's Testimony at 1207 ("Q[:] But do you know whether [Frost]—that anyone [from Frost] spoke with Capital City Public Charter School as well? A[:] If I could recall, I recall getting the invitation, the invitation has all the parties on it. I've never had a[n] incomplete invitation.").[8] The Invitation itself, however, did *not* indicate that a new placement might be discussed. *See* Sept. 3, 2010 Letter of Invitation at 472. The best that the record shows is that Capital City knew by September 14 that the question of the Student's placement could be discussed by the IEP Team. *See* HOD at 815 (explaining

---

[7] Ms. Gambale's September 8 email was sent to Janine Bennett of Frost, with copies to the Parent and an employee of James Brown & Associates, PLLC. *Id.* Ms. Bennett responded, in part, by asking if she could forward Ms. Gambale's email to Wanda Gregory, Capital City's LEA representative, but the record is barren of any answer from Ms. Gambale or evidence as to when the email might have been forwarded. *Id.*

[8] Defendants ignore this direct testimony from the Parent and offer a single sentence to impute knowledge of the Parent's conversation with Frost to Capital City. *See* Defs. Reply at 9 (arguing that the Parent's "testimony provides a basis for determination that [Capital City] was on actual or constructive notice of the Student's need for a more restrictive placement"). Defendants have offered nothing to support this statement, such as the actual, or even customary, communications between Frost and Capital City as LEA.

that Capital City sent an email to OSSE on September 14, 2010, which invited OSSE to the

September 20, 2010 IEP Team meeting and advised OSSE that the Parent likely would request a

residential placement for the Student).

The IDEA complaint alleged that Capital City did nothing to move the Student to

a new location until December 2010 despite an October 21 psychiatric assessment that said a

residential setting was necessary.  This allegation can only be described as breath-taking.  The

doctor's assessment was conducted on October 21 but his report was issued to *Ms. Gambale* on

November 19, on which date she sent it to Capital City.  The suggestion that Capital City should

have acted on the psychiatrist's report before November 19 was false and known to be false

when it was drafted and filed.  Indeed, Capital City had agreed that the Student should be moved

to a residential setting *before* it received the psychiatrist's report, another fact well known to Ms.

Gambale when she prepared the IDEA complaint.

The allegation that Capital City waited until December 6, 2010, to notify OSSE of

the requested relocation is similarly unsupported.  This error in the IDEA complaint was clearly

known to Ms. Gambale before the complaint was filed.  As a matter of record, Capital City

actually notified OSSE of the Parent's request on September 14, 2010, in the course of inviting

OSSE to the scheduled September 20 IEP Team meeting that was cancelled at Ms. Gambale's

request.  Admin. R. (Sept. 14, 2010 Email from Capital City's lawyer) [Dkt. 6-3] at 481.  More

to the point, Capital City directly advised Ms. Gambale no fewer than three times between

October 4 and October 7, 2010, that OSSE had been invited to the re-scheduled IEP Team

meeting in mid-October 2010, *see* Sept. 30 to Oct. 7, 2010 Email Chain at 485-86, and Ms.

Gambale attended the October 14 IEP Team meeting at which an OSSE representative

participated, *see* HOD at 816.  Later, on October 25, 2010, Capital City alerted all parties,

including Ms. Gambale and OSSE, Admin. R. (Oct. 25, 2010 Email from Capital City's lawyer) [Dkt. 6-3] at 513-14, that it agreed that the Student's placement should be changed to a residential school because of his ongoing difficulties, even without a psychiatric evaluation, HOD at 817. Finally, Ms. Gambale was copied on the October 28 email from OSSE which confirmed that the Student's school placement would be changed. *Id.* at 817.[9]

The Court finds that the time period between when Capital City, as LEA, received notice that the Student may need a residential setting (*i.e.*, sometime between September 8 and September 14, 2010) to when Capital City agreed that the Student did need a more restrictive facility (*i.e.*, October 25, 2010) was approximately seven weeks. If this time period represented any undue delay, it occurred entirely because Ms. Gambale rescheduled the September 20 IEP Team meeting to await a non-existent psychiatric report.[10] All multidisciplinary IEP Team members and necessary parties—including Frost, Capital City, and OSSE—were prepared to meet with Ms. Gambale and the Parent on September 20, 2010. *See* HOD at 815. Further, Ms. Gambale and/or the Parent failed to arrange for a prompt report from the psychiatrist after s/he

---

[9] Defendants try to salvage the IDEA complaint's errors by rewriting it. They now contend that the IDEA complaint alleged that Capital City did not notify OSSE of the results of Student's psychiatric evaluation until December 6, 2010. They also argue that Capital City unreasonably delayed until October 25, 2010, before it informed OSSE of the requested change in the Student's placement. These post-hoc arguments have no merit. The IDEA complaint alleged that Capital City did not notify OSSE of the Student's placement needs until December 6, 2010, *despite Ms. Gambale's certain knowledge to the contrary*. The new allegation that Capital City did not share the psychiatric evaluation with OSSE until December 6 is fabrication and irrelevant to the IDEA complaint, as filed and litigated. Ms. Gambale herself sent a copy of the Student's psychiatric evaluation to OSSE on November 19, 2010. *See* Nov. 19, 2010 Email from Ms. Gambale at 1.

[10] The record suggests that neither Children's Hospital nor the Psychiatric Institute of Washington actually had agreed to prepare a psychiatric evaluation of the Student so that the time between September 3, 2010, when Frost sent IEP Team invitations, and the actual IEP Team meeting (without a psychiatric report) on October 14, 2010, is entirely attributable to the Parent and Ms. Gambale.

evaluated the Student on October 21, 2010, so that the decision to relocate the Student was made without the benefit of that expertise.

No delay in obtaining a psychiatrist's report is attributable to Capital City. Copying Capital City, Ms. Gambale sent a fax to Frost on September 24, 2010, that requested a psychiatric evaluation of the Student. Capital City suggested six days later that the IEP Team needed to discuss the necessity of such an evaluation.[11] *See* Sept. 30 to Oct. 7, 2010 Email Chain at 488-89. At the IEP Team meeting on October 14, 2010, Capital City agreed to pay for a psychiatric assessment by a psychiatrist chosen by the Parent. *See* HOD at 816. That assessment was conducted exactly one week later. *Id.* at 817. Defendants failed to ensure a timely psychiatric evaluation when they selected the doctor and did not forward the report to Capital City and OSSE until November 19, 2010. *Id.*

Defendants protest that this delay was not their fault because, despite Ms. Gambale's diligent efforts, the psychiatric report was not released to her until November 19. Assuming that Ms. Gambale actually was diligent, a fact not supported in the record, the delayed psychiatric report was certainly not due to any action or inaction by Capital City, despite the allegation in the IDEA complaint that the evaluation was performed on October 21 and Capital City did not review it until December 6, 2010. The omission of any mention of the dilatory psychiatrist (surely a relevant fact) is attributable entirely to Ms. Gambale, which makes this allegation totally without foundation from the beginning.

---

[11] Defendants appear to contend that Capital City should have ordered a psychiatric assessment of the Student during the summer of 2010, on the theory that the Parent's conversations with Frost concerning a more restrictive placement put Capital City "on reasonable notice of [a] . . . need for a psychiatric evaluation to identify an appropriate program." Defs. MSJ at 14. Defendants' argument does not cite any fact or custom to support the argument that Capital City as LEA had, or should have had, actual or constructive knowledge of all conversations between Frost and the Parent, much less the particular 2010 summertime conversation(s) concerning the Student's fights and his placement.

Attempting to rescue themselves from the record evidence, Defendants argue that Capital City impeded the Student's transfer to Devereux by not reviewing the psychiatric evaluation until December 6, 2010. The record provides no support to the newly-minted argument, which is a red herring. Either Ms. Gambale or the Parent, not Capital City, chose the seemingly laggard psychiatrist, who examined the Student on October 21 but failed to issue his report until November 19. Prior to that report, Capital City agreed that the Student should be transferred to a residential treatment facility, as soon as it learned of the Student's return to the Psychiatric Institute of Washington on October 25, 2010. *See* HOD at 817. That same day, Capital City notified all relevant parties that it agreed to a new placement. OSEE concurred a mere three days later—also before the psychiatric evaluation was received. *Id.*

Thus, the record shows that Capital City and OSSE were fully prepared to go forward with a new placement by late October 2010. And then, when Capital City proposed holding an IEP Team meeting as soon as November 30, 2010, to discuss the psychiatric assessment received on November 19, *see* Nov. 24, 2010 Letter to Ms. Gambale at 538 (offering to schedule an IEP Team meeting on November 30, December 1, December 6, or December 7), the Parent sought delay until December 6, 2010, *see* HOD at 818.

Defendants also offer no support for the allegation that Capital City was responsible in any way for the approximate fifteen-week gap between its concurrence with a residential placement for the Student and his actual transfer. A predicate to OSSE's ability to transfer the Student was the provision of the Parent's signature on the interstate compact form. OSSE told Ms. Gambale on November 19, 2010, that the signed form was still outstanding. There was no response until January 7, 2011, when Ms. Gambale finally submitted the signed form to OSSE. *See id.* OSSE submitted the form promptly to the District of Columbia Child and

Family Services Agency, and, on January 21, 2001, OSSE notified the Parent that it had issued a location assignment for the Student to Devereux. OSSE then transported the Student to Devereux on February 4, 2011.[12] *Id.* at 818-19.

In short, there is not, and never was, any basis to claim that Capital City delayed the Student's relocation to a residential treatment facility. Critical for the immediate purposes, Ms. Gambale knew personally all the relevant facts and, nonetheless, drafted and litigated the IDEA complaint concerning alleged delay that was frivolous, unreasonable, and without foundation from the date the IDEA complaint was filed. The Court finds that Defendants knew, before filing the IDEA complaint, that Capital City was notified of the potential need for the Student's re-location on an unidentified date between September 8, 2010, at the earliest, and September 14, 2010, at the latest; that Ms. Gambale and the Parent were responsible, not Capital City, for re-scheduling the IEP Team meeting from September 20, 2010 to October 14, 2010; that Capital City agreed at the October 14, 2010 IEP Team meeting to pay for the necessary psychiatric assessment by a doctor of the Parent's choosing; that Capital City agreed on October 25, 2010, without receiving a psychiatric assessment, that the Student should be relocated; and that from October 28, 2010, when OSSE agreed to relocate the Student, until January 7, 2011, the transfer could not happen without a parental signature on the interstate compact form, which Defendants failed to provide even though they well knew it was a necessary requirement. Ms. Gambale played a central role as these events unfolded and knew these facts before she drafted an IDEA complaint against Capital City that was frivolous, unreasonable, and without foundation.

---

[12] It appears that it was not easy to locate an appropriate school for the Student and Ms. Gambale argues that only her efforts were successful, not those of OSSE. Because the IDEA complaint only challenged Capital City's compliance with IDEA, OSSE's actions are not relevant and will not be addressed.

That the Student missed nearly six months of the school year while awaiting placement in a residential treatment facility is unfortunate. The Parent's frantic efforts to help him are perfectly understandable. But a parent's concern does not license an attorney to file an IDEA complaint that is comprised of allegations that were known to be frivolous, unreasonable, and without foundation *ab initio*. As the Hearing Officer determined, if anyone were responsible for delaying the Student's placement in a residential treatment facility, it was Ms. Gambale and the Parent. Defendants' claim that they could have prevailed at the due process hearing but for the Hearing Officer's credibility determinations is a canard. As the hard facts demonstrate, at no point in the litigation, were the allegations of delay set forth in the IDEA complaint "plausible, though ultimately unsuccessful." *Prescott*, 631 F.3d at 1126. Capital City is entitled to recover its attorney's fees in connection with the allegations of delay.

### 2. The Allegations Concerning the Student's IEPs

The Hearing Officer conclusively determined that Capital City prepared appropriate transition plans for the Student as part of the IEPs developed by the IEP Team on September 20, 2010, April 15, 2011, and March 19, 2012.[13] Defendants criticize the September 20, 2010 IEP for not including "independent living goals for personal hygiene, self-advocacy, identifying health-related resources in the community, and maintaining a proper diet." Defs. MSJ at 19. They fault the April 15, 2011 IEP for not including "measurable goals" for post-secondary education or employment, and not rectifying the faults of the September 2010 plan. *Id.* Defendants further complain that the March 19, 2012 IEP did not include goals to enable the

---

[13] *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (first IEP after student turns sixteen-years-old must contain "appropriate measurable post[-]secondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"); 34 C.F.R. §§ 300.43, 300.320(b) (transition services are part of special education).

Student to visit and select a college, prepare for the SAT, or complete applications for college entrance, financial aid, and campus living. *Id.*

Contrary to Defendants' arguments presented here, the Hearing Officer detailed at length the attention and training the Student received in the exact areas in which the three IEPs allegedly failed to set goals. *See* HOD at 821-23. Relying on their argument concerning credibility determinations, Defendants contend that a claim is not frivolous, unreasonable, or without foundation simply because the opposing party presented more convincing evidence or was more persuasive. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). They make a legitimate point of law but it is not applicable to the question of Capital City's recovery of attorney's fees. The Hearing Officer did not render judgment based solely on credibility determinations. To the contrary, the Parent failed to satisfy her burden of showing that the IEPs (1) lacked the long-range goals of which she complained and (2) were inappropriate without such goals. *See* HOD at 830 (placing burden on the Parent to prove that the Student's IEPs were deficient); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005) (burden of persuasion in IDEA litigation on the party seeking relief). While the Hearing Officer discredited *some* of the Parent's testimony, the HOD hinged on the Parent's failure to present *any evidence* to support her claim that any one of the IEPs was insufficient.

With respect to the September 2010 and April 2011 IEPs, the Hearing Officer ruled that the Parent "presented no testimony on the appropriateness of" these IEPs, "other than that they lacked goals to help the Student improve his personal hygiene and eating habits." HOD at 830. Even more to the point, the Parent "presented no testimony on whether these goals *should have been included* in the Student's transition plan or whether they would have been

addressed in a behavior implementation plan." *Id.* (emphasis added). Similarly, regarding her complaint about the March 2012 IEP, the Hearing Officer found that the Parent:

> presented no testimony to show that completing college applications and taking a college tour would have been necessary elements of the Student's transition plan. In other words, [the Parent] presented no evidence that the college application process, and college tours, would be the responsibility of [Capital City], as opposed to obligations of . . . [the Parent].

*Id.* Stated differently, the Hearing Officer did not accept Ms. Gambale's legal argument, which Defendants also present here, that since IDEA specifically outlines independent living skills and post-secondary education and employment as areas for which transition services and goals may be "appropriate," *see* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa), the March 2012 IEP was insufficient as a matter of law because it did not include the Parent's *preferred* goals that had been rejected by the IEP Team. IDEA, however, only mandates the inclusion of "appropriate measurable" goals in IEPs for students aged sixteen years or older. *Id.*

Moreover, Defendants' argument misapprehends the Hearing Officer's decision. The Parent presented *no* evidence that personal hygiene and eating habits, or completing college applications and taking college tours "should have been included" in the Student's transition plans. HOD at 830. In addition, the Hearing Officer noted the uncontested testimony of the Student's teacher that Devereux gave thorough attention to the Student's life skills and post-secondary training. *See* HOD at 830; Admin. R. (Testimony of Matthew Zenuk, a special education teacher at Devereux) [Dkt. 6-9] at 1382-1401. In contrast, the Parent offered only conclusory assertions that the Student had received inadequate training, *see, e.g.*, Parent's Testimony at 1279 (Q[:] [I]t's your position that Devereux has done nothing to prepare him for life after high school, is that accurate? A[:] It's pretty accurate."), and generally complained about the *results* of the Student's training and education, *see, e.g.*, *id.* at 1252 (opining that the

Student lacks the "skills to maintain [a] job" as shown by recent "inappropriate comments" he made "in a social setting with his peers").

An LEA is required by IDEA to develop IEPs that are "reasonably calculated to enable the [disabled student] to receive educational benefits." *Rowley*, 458 U.S. at 207. As the Hearing Officer noted, "[A] school district need not maximize the potential of children with disabilities, but the door of public education must be opened in a meaningful way, and the IEP must provide the opportunity for more than only 'trivial advancement.'" HOD at 824 (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008)). Success is not assured by IDEA, only opportunity. The Parent complained that Capital City did not ensure that the Student's IEP contained specific goals. The Hearing Officer disagreed; not only did the Parent fail to provide any evidence to support her claim, but she ignored the training and education that the Student clearly had received and she complained about items (such as registering for the SAT) that were her responsibility.

The Parent also complained that Capital City refused to fund a college tour that the Parent had arranged. She complained that the lack of funding interfered with the Student's post-secondary advancement. The IDEA complaint rang hollow in 2012 and does so now: Capital City asked for further information regarding the proposed college tour, but Ms. Gambale never provided anything. *See id.* at 820. After the resolution meeting, Capital City sent a written settlement offer to pay the cost of the tour, but Ms. Gambale never responded. Most critically, college tours are not an activity intrinsic to the IEP transition process. IDEA mandates a FAPE for disabled students through a secondary school education. 20 U.S.C. § 1401(9)(C); 34 C.F.R. § 300.17. IDEA does not require a school district or LEA to support the costs of a student's post-secondary education, of which visiting colleges is a part.

Consequently, the allegations in the IDEA complaint concerning supposed deficiencies in the Student's IEPs were frivolous, unreasonable, and without foundation from the beginning and did not become less so over the course of the litigation. Capital City may also recover its attorney's fees in connection with this portion of its defense to the IDEA complaint.

### C. The Requested Attorney's Fees Are Reasonable

The typical metric of the reasonableness of attorney's fees is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), *abrogated on other grounds by Gisbrecht v. Barnhart*, 535 U.S. 789, 795-805 (2002), and the party seeking attorney's fees bears the burden of establishing its entitlement to such an award, *In re North*, 59 F.3d 184, 189 (D.C. Cir. 1995) (per curiam).

A fee applicant must establish the reasonableness of the attorney's hourly rates. This can be achieved by explaining billing practices, skill, experience, and reputation of the attorney, as well as "the prevailing market rates in the relevant community." *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). The fee applicant must also demonstrate the reasonableness of the hours that the attorney billed to the matter. This may be established through the submission of an invoice that is sufficiently detailed so as to "permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) (per curiam). The fee application need not, however, "present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Cobell v. Norton*, 231 F. Supp. 2d 295, 306 (D.D.C. 2002). The billing descriptions can be read in context, with clarification coming from surrounding billing entries as well as the docket. *Heard v. District of Columbia*, Civ. No. 02-296, 2006 WL

2568013, at *14-15 (D.D.C. Sept. 5, 2006), *appeal dismissed*, No. 06-7183, 2007 WL 465615 (D.C. Cir. Feb. 5, 2007).

Section 1415(i)(3)(C) of IDEA provides that hourly rates "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." In this jurisdiction, the commonly accepted benchmark for prevailing market rates for attorney's fees in complex federal court litigation comes from the *Laffey* Matrix, which was first were established in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *modified by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (*en banc*). *See Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 102 (D.D.C. 2010) (collecting cases and finding that "numerous judges in this district have applied *Laffey* rates in the context of fee awards arising out of IDEA administrative proceedings"), *appeal dismissed*, No. 10-7050, 2010 WL 2574191 (D.C. Cir. June 2, 2010); *cf. Agapito v. District of Columbia*, 525 F. Supp. 2d 150, 152 (D.D.C. 2007), *appeal dismissed*, No. 08-7004, 2008 WL 1868311 (D.C. Cir. Apr. 18, 2008). The parties agree that the *Laffey* Matrix applies here. Capital City asks for an award at an hourly rate equal to three-quarters of the *Laffey* Matrix rate for the time that its attorney billed to its matter and Defendants do not object.

Capital City has demonstrated the skill, experience, and reputation of the single attorney, Lauren Baum, who represented it on this matter. *See Covington*, 57 F.3d at 1107. Ms. Baum has attested that she is a 2008 graduate of the American University Washington College of Law and member of the Maryland and District of Columbia bars, has operated her own practice since August 2010, and, at the time of the underlying litigation, had practiced for four years. *See* Pl. MSJ, Ex. 3 (Decl. of Ms. Baum) [Dkt. 7-2] ¶¶ 1-5. Further, she has averred that she has

extensive IDEA experience, advising more than thirty charter schools in special education matters and appearing in more than 150 IDEA due process hearings.  *Id.* ¶¶ 6-7.  None of this is contested.

Mrs. Baum states that she worked on the administrative litigation from March 8 to June 22, 2012, and billed 55.9 hours at her hourly rate of $225.00.  Accordingly, her attorney's fees for this matter totaled $12,577.50.  *Id.* ¶¶ 8-9.  For an attorney with four years of experience, the *Laffey* Matrix sets a rate of $290.00 per hour.  *See Laffey* Matrix 2003–2012, *available at* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf (last visited Mar. 12, 2014).  Ms. Baum concedes that her hourly rate is "marginally higher than three-quarters of the *Laffey* Matrix rate," but contends that it is reasonable in light of the complexity of the administrative action and the due process hearing which lasted two days and involved seventy-seven exhibits and eight witnesses.  Pl. MSJ at 30.  Since the Defendants do not contest any of these points or challenge Ms. Baum's hourly rate in any way, the Court will accept Ms. Baum's hourly rate as reasonable.

Ms. Baum asserts that the time she charged to the Capital City representation in this matter was reasonable, and submits a supporting invoice.  *See id.*, Ex. 4 (Invoice) [Dkt. 7-2].  The invoice details the hours Ms. Baum worked and describes the tasks that she performed.  Accordingly, a presumption arises that the number of hours that Ms. Baum billed are reasonable.  Defendants bear the burden of rebutting this presumption, *see Covington*, 57 F.3d at 1109-1110, which they have hardly done.  Defendants only contest entries for two IEP Team meetings that were not "convened as a result of an administrative proceeding or judicial action."  Defs. MSJ at 27 (citing 20 U.S.C. § 1415(i)(3)(D)(ii)).  Ms. Baum concedes that the challenged time is not

reimbursable and withdraws her request for payment for those two particular entries, which total $810.00.

Having found both the hourly rate and the hours expended essentially uncontested and reasonable, the Court will award Capital City $11,767.50 in attorney's fees.

### IV. CONCLUSION

The Court will grant Capital City's Motion for Summary Judgment, Dkt. 7, and deny Defendants' Cross-Motion for Summary Judgment, Dkt. 8. Capital City will be awarded $11,767.50 in attorney's fees. A memorializing Order accompanies this Opinion.

_____/s/_____
ROSEMARY M. COLLYER
Date: March 20, 2014                    United States District Judge